May it please the court, I'm Sean Potts, I represent the petitioner. The issue in this case is whether or not the agency considered the totality of the evidence in the aggregate. In the agency's decision, which adopted the immigration judge's decision, it never reached the issue of state acquiescence. The immigration judge looked at the evidence and gave alternative conclusions. The immigration judge reviewed the issue as to whether or not the Salvadorian government officials would, their conduct would make it more likely than not that the petitioner would be harmed. And then in an alternative argument, the court reasoned that gang members, that their conduct wouldn't equate to more likely than not that the petitioner would be harmed. The error in this case was that the judge did not consider the conduct of both the Salvadorian officials and the gangs as it relates to one another. She considered the evidence in the alternative. And in doing that, the whole question of government acquiescence was never addressed. Specifically in the BIA's decision, the BIA at the end of its decision stated that it need not reach the issue of government acquiescence because we adopt the court's finding that there's insufficient evidence that the gangs will torture the petitioner. I've been listening and trying to figure out. If in the first instance the agency says you've got a burden of showing it's more likely than not you will be tortured on return, and second you have to show that that torture will either be by the government or with government acquiescence, and they don't find a likelihood of torture, why do they have to then figure out whether the gangs operate with government acquiescence? Well, all the conclusions of the agency have to be rational and not arbitrary. So when you look at... Why is the agency's conclusion that your client was not more likely than not to be tortured on return irrational? Because the... In order to get to more likely than not, it's a quantitative analysis. What happened in this situation is that the agency looked at the evidence piecemeal. Based on these risk factors, it's not more likely than not. Based on these risk factors, it's not more likely than not. And based on these risk factors, it's not more likely than not. But what the agency failed to do was to consider how all the risk factors interplay with one another. Isn't that a qualitative analysis rather than quantitative? I mean, you're not urging that somebody should just go through and just check boxes and then add them up, are you? I'm saying the exact opposite. I'm saying what happened here was that the... There's a... The Salvadoran government has legislation which requires individuals who have certain characteristics, they're subject to arrest. Also, the expert witnesses testify that upon arrival, the individuals will be arrested and detained. The evidence further goes on to say once they're arrested and detained, they'll be housed with rival gang members. What happened here in this case was the court looked at each one of those factors, found them to be credible, but didn't consider them as they interrelated to one another, as they interplay with one another. So on one aspect, these individual occurrences may not equate to torture, but when you have a situation where the court acknowledges that the prison officials will acquiesce, when you have a situation where prison officials acquiesce and the court acknowledges that, and you have a situation where the court acknowledges that individuals in this situation who will be mandatorily arrested and detained and housed with rival gang members, that that would amount to harm, we must consider that, the interplay of that. And so when the agency says, well, we need not address that issue, then it makes the conclusions irrational. So all of these conclusions that the immigration judge and the agency are reaching is arbitrary. But I think what you're saying to us is that you think their conclusion that he would not, he would not be likely subject to torture upon return was not supported by the evidence. It was not supported by the evidence once the evidence is read in totalitary and aggregated. So really you're making an argument that there was not substantial evidence to support this conclusion. Respectfully, there wasn't substantial evidence to reach that conclusion, but respectfully, it's a legal question. And the legal question is, in order for there to be a consideration of the substantial evidence, must the evidence be considered in the aggregate? And this agency didn't do that, and it explicitly said we need not do that. Because if the court would allow me to... You didn't literally say that. We didn't literally say that, but the IJ recognized different risk factors. And the IJ created alternative conclusions as to the more likely than not that this individual would be tortured. However, each of these risk factors weren't considered in its aggregate. Our position is that in order for a conclusion, a legal conclusion, to be rational and not arbitrary, we must consider the totality of the evidence in the aggregate. And that didn't happen here. That doesn't seem to me to be a fair reading of what the IJ did. The IJ went through and analyzed each of them and came to a conclusion. Do they need to have some kind of magic words that say, hey, we're considering all of these things in the aggregate? I believe the IJ stated in the oral decision, the IJ, this was the holding, the IJ said that based on the consideration of the evidence, based on the consideration of this individual's two expert witnesses, we don't find that it's more likely than not that the Salvadorian government will torture this individual. Alternatively, considering the risk factors related to gang activity, we don't consider that evidence more likely than not that the gangs will torture the individual. And you're saying you need to add the two together, in effect. Yes. Here's my mathematical problem with that. So help me. I'm not a math wizard. But if it's less, if it's a less than 50 percent chance, less likely on the government side and less likely on the gang side, doesn't it mean it's less likely in the aggregate? Respectfully, no, Your Honor. Tell me why. Because. I mean, 50 times 50 is a quarter. Well, bear with me for a moment. Respectfully, if the Salvadorian government, their arresting, their arbitrary arrests, the police brutality, if that doesn't amount to torture, that's understood. And if the gang's conduct doesn't amount to torture, that's understood as well. But when you have a situation where the police acquiesce to the gang violence and doesn't do anything to prevent it, when you look at those two as they relate, that is where the torture comes into play. And in this case, it was specifically stated that we're not going to conduct that type of analysis. It's turning the blind eye, which is a harm. All right. Got that point. Do you want to save a minute and a half for rebuttal? Yes, I would, thank you. Okay, great. We'll hear from the government. May it please the Court, Dara Smith for the Attorney General again. In this case, Mr. Condito has not presented compelling evidence that he's more likely than not to be tortured in El Salvador either by gangs acting with the government's acquiescence or by the Salvadoran government itself. So turning first to the gang claim, what the agency found in this case is that Mr. Condito is not likely to be targeted by gangs at all. And that's based on his experience in the United States. So Mr. Condito participated in gang activity in the United States, left the gang, remained in a nearby neighborhood for over ten years, and heard nothing from the gangs at all. Nobody attended. It seems that the gangs here are like the gangs in, you know, the gang culture here is the same as the gang culture in El Salvador. Respectfully, Your Honor, it doesn't assume that they're exactly the same, but it does assume that one particularly important fact is the same, which is the country reports determination which the expert, Mr. Rees, agreed with, that if the gang wants to target you, they're going to find you anywhere. The police are not going to stop them. They're not going to be able to. And so if they were going to try to target him anywhere, they would have tried in L.A. Maybe they wouldn't have succeeded, but that they would have tried. They would have tried to at least threaten him, at least say something to him. I mean, he went in and out of gang territory in L.A. the entire time he was there and never encountered any problems. I don't find that particular piece of evidence to be particularly compelling. Maybe we have better police in the United States. Maybe they don't act with government acquiescence. But I'm not sure what that evidence has to do with his burden of demonstrating that he would likely be tortured there. I mean, I see that it's cited, but I frankly don't give it very much weight. It's like saying, well, you weren't murdered in Chicago, so you're not likely to be murdered in Beirut. It just doesn't do much for me. So what else have you got? Next. Okay. If the main claim here is that what's likely to happen is that Mr. Convito is likely to be imprisoned upon arriving in El Salvador and that then he would be subject to gang harm while in prison, that doesn't show that he's more likely than not to be tortured. And basically what the immigration judge found, other than the other findings, is that he's likely to be detained and released, and that if he does come to harm in prison, that isn't torture. And this Court has case law, Villegas is the main case on this point, that harm in prison is not necessarily torture, that harsh prison conditions aren't. And actually, additionally, in the case of Arteaga, this Court said that the possibility of gang violence and riots in prison didn't necessarily equate to torture. So there was no acquiescence finding in this case. So if the Court believes that it's more likely than not that Mr. Convito would be tortured in prison by gangs, then the Court would need to remand to the agency to determine whether or not the government would acquiesce in that harm that would occur. So on that issue, Petitioner presented, I think, an expert, Mr. Rees? And two experts. Two experts. But I think Mr. Rees specifically testified that there was an official policy of apprehending gang members and that he provided some testimony about why they were likely to be tortured while in prison. Did the I.J. discount that testimony? Did he rely on something to the contrary? How did the I.J. reach the conclusion that it was less likely than Mr. Condito, I should better say since I can't pronounce the other name correctly, Mr. Condito was unlikely to be tortured? With respect to gangs, of course, the immigration judge did primarily focus on what had happened in the United States, and that's the primary assessment of that evidence. As far as what would happen in prison, the immigration judge talked about different gang members being housed in the same cell and that that could result in killings in prison, but he said that the authorities are outmanned and outgunned in many ways. But the board specifically did not rely on the acquiescence determination below. So, again, if the Court believes that an acquiescence determination on the harm from gangs is necessary, then we may not. Let me ask the question differently then. There was an expert testimony about acquiescence. What was the contrary testimony? About acquiescence? There was no contrary testimony about acquiescence. The board didn't reach the acquiescence issue. And the immigration judge found that. And the government's attorney didn't present any evidence. Right. Acquiescence was really not discussed. And it isn't, respectfully, Your Honors, it's not about aggregating the two. It's really they're two separate issues because there's a finding evidence. No, I understand. So that's why I was focusing on the torture side of it. And there's an expert who at least opines that it's likely that he'll be tortured if he's imprisoned. The I.J. and the BIA say, no, we don't buy that. And I'm trying to figure out what the contrary testimony to the expert is, what the contrary evidence to the expert about the likelihood of torture. I'm not sure that there would be a specific piece of evidence that directly contravened that statement by the expert. I mean, that's the thing. So if there isn't, how did the I.J. and the board rationally find that he was less likely than not to be tortured, less likely to be tortured? That he wasn't more likely than not to be tortured? He put out an expert who said, I think he's likely to be tortured if he's in prison. The I.J. and the BIA don't reach the acquiescence issue because they say he hasn't carried his burden. So is it – and I don't find anything that say we disbelieve the expert. No, I don't. So what's the other evidence? I mean, I don't think that the agency believed that he was likely to be hung by gang members at all, whether in prison or otherwise. But if there was violence in prison from gang members, that that wasn't torture because – I guess because the specific intent requirement isn't met there. So, I mean, the immigration judge discusses the fact that there are – there could be violence in prison, but just doesn't find that that's a clear probability of actual torture. So what they do is, in effect, say, we hear the expert's testimony, but we don't think that establishes a likelihood of torture. Not exactly, Your Honor. I mean, the immigration judge did discuss the country reports as well. And the country reports don't say no one is tortured in prison, but they talk about how there is some inter-gang violence in prison, but don't talk about any instances of actual torture. And, again, persecution and torture are not the same thing. The fact that he could be harmed by gang members in prison during inter-gang violence doesn't establish the high burden to show specific intent to torture. So what the IJ found was that what was likely to happen if he were imprisoned was either nothing or harsh regular sort of prison conditions, including, you know, overcrowding and things like that, or that there could be inter-gang violence in prison, but didn't find that that is torture. And the country reports would support that discrimination to the extent that they don't talk about gang members torturing other gang members in prison. So if there's – there could be violence, but not torture. And that's – that is drawing a lot out of the immigration judge's decision, because it doesn't – it doesn't go into that in great detail, that specific part of the analysis.  And that authorities have been accused of human rights violations, and that's drawn from the State Department reports. But not that gang members are likely to torture him in prison. But, again, because the board didn't reach the acquiescence issue, it is difficult to rely on that. Do the country reports, as I read them, they're largely devoted to the absence of acquiescence, that the government has now taken strong action against these gang members, but doesn't support them. Are they – they're not really addressed to the likelihood of violence at the hands of the gangs, are they? They do have some information about that. Although they discuss the government a lot, they talk about conditions in prison. That's certainly part of the country reports. And they talk about sort of general violent conditions that exist, including gang violence. And they don't have any numbers specifically about how often, you know, gang killings happen and things like that. But they do have some information about prison and about torture. So there are sections devoted to that in the country report. They just aren't – Well, the I.T. seems to make a finding towards the end of his decision. He said, it is correct that there are many allegations of human rights violations by the government, and that the government does indeed target deportees and those associated with gangs. But the evidence suggests that these individuals are arrested, meaning deportees, I gather, perhaps beaten or harmed at times and eventually released. Yes, Your Honor, and that's the immigration judge's finding about what the government itself is going to do. So what the immigration judge found to be likely is that people would be detained and eventually released. And that they might be harmed at the hands of the government while in And that's what the immigration judge found about what the government itself was going to do. And I don't believe that's specifically related to gang acquiescence, but it's about what's likely to happen. And essentially, the immigration judge thought that what was likely to happen is that he might be arrested as a gang member, because that's very likely to happen, but that he wouldn't be tortured by the government at that point. They'd be likely to hold him, perhaps harm him but not torture him, and So I'm still trying to figure out the IJ's conclusion that the petitioner would not be targeted for torture by the gangs. So we have to put aside the acquiescence issue for a second. There's no finding of acquiescence. But what supports that conclusion? The conclusion about the gangs is related to Mr. Candida's experience in the United States. I mean, that's essentially what it relies on. And the reason that it's about that, though, is just to clarify, it's not just the assumption that everything is exactly the same in El Salvador or that the police are exactly the same, but it has to do with both the country report and the expert's testimony. So the immigration judge discussed with Mr. Reese why it might be that he believes that, notwithstanding the fact that Mr. Candida was fine in the United States, that he would now be subject to harm in El Salvador. And Mr. Reese suggested that he believed that the police were likely to be a deterrent here. And that immigration judge asked him, are they deterrent? Is there any evidence that they actually do prevent gangs from harming people in the United States? And he said, no. Mr. Reese said, no, there's no evidence of that, but maybe they believe that anyway. So you've got an issue paper that says you're not any safer in El Salvador than here because they'll come and get you. And the expert agreed with that statement. What about the statement that Mr. Candida made that he was being protected, at least in some sense, because his brother was in prison and still had influence with the gang and that that was deterring assaults on him. Yet he apparently has another brother in prison in El Salvador who has reported that, you know, if he leaves the gang in El Salvador, he's on his own because they're going to hunt him down. I think Mr. Sanchez was the one who talked about having a relative that was protecting him because he was in prison. Was that it? I think that that's right. I think that there was contradictory testimony about the effect of having a relative in prison in El Salvador and whether they would protect them or whether, in fact, that would make the situation worse. It was really pretty inconclusive as to what kind of effect that would have. I thought he was referring to two different brothers. It's one brother in prison in El Salvador. Is that what we're talking about? I believe that that's right, Your Honor. There is a lot of testimony about that, and it can be unclear at times, but I believe that's the case, that he has a brother there and that that could potentially protect him or could potentially draw him to the attention of the authorities or could make gang members more aware of his presence. And it's really unclear. And in a situation where the evidence is conflicting, there's really no  And I understand that the decision that because he hasn't been harmed in L.A., he won't be harmed in El Salvador is not necessarily intuitively very convincing. But it wasn't just based on the immigration judge's speculation. It was based on the testimony and the evidence and the record. Did the immigration judge in this case find that the petitioner just simply hadn't carried his burden of establishing that he would be more likely than not to be tortured by gangs if he returned to El Salvador? Yes, or by the government, that he didn't need his burden. And what the evidence that he was not more likely, he put in some evidence that he was likely to be tortured. And the evidence on the other side was the absence of farm in the United States, the country report, and what else? And I believe it's the same profile of asylum claims as well. But essentially the country conditions information that he was not in a substantially worse situation than most gang members would be. And so that general country conditions information would bear on what was likely to happen. So it was general country conditions information about former gang members that suggested that they would not likely be tortured. Effectively, Your Honor. Although the evidence that Mr. Condito put on the experts who testified for him didn't say anything, they talked about his situation, but they also talked about what was likely to happen to gang members. And nothing that he has experienced specifically would make him in a different situation than the average gang member in particular, except that he apparently was not a target while in the United States is the most different information about him. Okay. I think. Okay. Thank you, Your Honor. Thank you. A minute and a half. Your Honor, the Petitioner was in a remarkably distinguished position from most gang members. He was a former gang member who had renounced the gangs while he was imprisoned. Moreover, he was a member of an organization, an anti-gang organization called Homage to Needles, and he spoke out against gang activities. While he did that here in Los Angeles, they were under the scrutiny of the Los Angeles authorities. So, and the court recognized all those factors. All those factors gave him a degree of protection here in the United States. Also, the fact that if he's returned to El Salvador, he's going to be, he's not going to run into problems with a gang, that conclusion is quite arbitrary, because in this record, he was an anti-gang spokesperson with this organization, under the scrutiny of the Los Angeles Police Department, and all those things served to protect him from gang harm. And those things wouldn't be present in El Salvador if he was to return. And as far as acquiescence, in this record, at 930, on page 934 of the administrative record, the court acknowledges that the Salvadoran prison officials will acquiesce. And also, when it comes to the more likely than not that the petitioner is going to be harmed, in the administrative record at page 16 and at page 50, the court notes that the Salvadoran government has anti-gang laws which mandate Salvadoran officials to arrest individuals. That mandate is an ongoing mandate. So if an individual is going to be constantly arrested as a... Why is that torture? We may not like that. I mean, that's... The fact that he'll be constantly arrested and detained, and while he's detained, that the prison officials will acquiesce to his harm, that continual arrest, that continually being detained, that continually being put in the lion's den, creates an inevitability that he will be more likely than not harmed. But didn't Mr. Reese testify that it's possible to renounce your gang affiliation and that if you can establish that you've renounced your gang affiliation over a period of time, that you'll be released and left alone, but that the El Salvadoran police are really not in a position to protect these people? Or was that Mr. Sanchez? One of the two of them testified to that, I thought. I believe that was Mr. Reese. But I think when we look at that testimony, in conjunction with the fact that this individual who is agreed... The evidence states that he will be a target of the rival gang. This individual who is going to be constantly rearrested, put in a situation where the authorities will acquiesce, it's only a matter of time that that harm will amount to torture. Because what's happening is that there's an official policy to return this person to harm. And so, inevitably, that harm is going to rise to torture. All right. Thank you. Thank you very much. We appreciate your arguments. The matter is submitted.
judges: Erickson, Paez, Hurwitz